17 MAG 4939   ORIGINAL

Approved: _____/s/ Vlad Vainberg_____
Vladislav Vainberg/Justin V. Rodriguez/Brooke Cucinella
Assistant United States Attorneys

Before: THE HONORABLE KEVIN NATHANIEL FOX
United States Magistrate Judge
Southern District of New York

U.S. DISTRICT COURT FILED JUN 29 2017 S.D. OF N.Y.

------------------------------- x
UNITED STATES OF AMERICA           :   SEALED COMPLAINT
                                   :   Violations of 18 U.S.C.
         - v. -                    :   §§ 1343 and 2
                                   :
RENWICK HADDOW,                    :   COUNTY OF OFFENSE:
                                   :   NEW YORK
              Defendant.           :   DOC #__
------------------------------- x

SOUTHERN DISTRICT OF NEW YORK, ss.:

MELISSA BERESFORD, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

**COUNT ONE**
(Wire Fraud)

1. From at least in or about November 2014 through at least in or about December 2015, in the Southern District of New York and elsewhere, RENWICK HADDOW, the defendant, willfully and knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, HADDOW engaged in a scheme to defraud victims by soliciting funds through material misrepresentations for investment in a company created by HADDOW called Bitcoin Store Inc. ("Bitcoin Store").

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT TWO
(Wire Fraud)

2.      From at least in or about July 2015 through at least in or about June 2017, in the Southern District of New York and elsewhere, RENWICK HADDOW, the defendant, willfully and knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, HADDOW engaged in a scheme to defraud victims by soliciting funds through material misrepresentations for, among other things, equity and lease investments in a company called Bar Works Inc. ("Bar Works") and related entities controlled by HADDOW.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for deponent's knowledge and for the foregoing charges are, in part, as follows:

3.      I am a Special Agent with the FBI and am one of the law enforcement agents with primary responsibility for this investigation. I have been a Special Agent with the FBI since 2015. I am currently assigned to a squad responsible for investigating wire fraud, bank fraud, securities fraud, money laundering, and other white-collar offenses. As part of my work at the FBI, I have received training regarding securities fraud and white collar crimes. The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources and agents, including documents and information provided to me by representatives of the U.S. Securities and Exchange Commission ("SEC"), documents provided by financial institutions and investors, interviews of investors and associates of RENWICK HADDOW, the defendant, and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where dates, figures, and calculations are set forth herein, they are approximate.

THE DEFENDANT AND RELEVANT ENTITIES

4. RENWICK HADDOW, the defendant, is a citizen of the United Kingdom who principally resided in New York, New York from at least in or about October 2014 through the present.

5. Based on my review of United Kingdom court records and online reports, I have learned the following:

   a. In or about November 2008, the Companies Investigation Branch of the Insolvency Service of the United Kingdom ("CIB"), an agency responsible for investigating serious corporate abuse in the United Kingdom (the "U.K."), disqualified RENWICK HADDOW, the defendant, from serving as a director of any company registered in the U.K. for a period of eight years, through about November 2016. According to an online press release published by a U.K. government and public sector news alerting service in or about December 2008, HADDOW had served as a director of a failed U.K. company whose investors lost all or substantially all of their investments. As set forth in the release, as part of his disqualification, HADDOW consented to a schedule of unfit conduct that stated, in part and substance, that HADDOW caused or allowed the now-insolvent company to make various misleading statements about its financial position and prospects.

   b. In July 2013, the U.K.'s Financial Conduct Authority ("FCA") brought a civil action against HADDOW and others for allegedly running various unauthorized collective investment schemes that raised £16.9 million in funds through, among other things, misleading statements to investors.

   c. In February 2014, the High Court of Justice, Chancery Division, ruled, in substance, that the schemes at issue were in fact unauthorized collective investment schemes. The ruling was publicized in the British press.

   d. In March 2015, the British Court of Appeal dismissed the appeals filed by HADDOW and others. The ruling was publicized online. According to the FCA's public website, a trial on the remaining issues is forthcoming.

6. Based on my review of corporate, banking, and tax records, I have learned the following:

### In Crowd Equity, Inc.

   a. In Crowd Equity, Inc. ("InCrowd") is a Delaware corporation that at all relevant times was principally owned and

3

controlled by RENWICK HADDOW, the defendant. On or about November 24, 2014, HADDOW incorporated InCrowd, designated himself as the sole member of InCrowd's board of directors, and purchased all of InCrowd's then-existing shares for $500. On its website www.incrowdequity.com ("InCrowd Website") and in materials sent to investors, InCrowd represented itself as a type of crowdfunding portal through which investors could purchase shares of start-ups vetted by InCrowd.

   b. In or about December 2014 and January 2015, HADDOW opened at least two bank accounts on behalf of InCrowd at Bank of America, the first ending in the number 3084 (the "InCrowd 3084 Account"). HADDOW designated himself as the sole authorized signatory on both accounts. In connection with both account openings, HADDOW provided Bank of America substantially similar certified copies of InCrowd's corporate resolutions listing him as the president of InCrowd.

   c. On June 10, 2016, HADDOW signed, as president of InCrowd, InCrowd's federal tax return for the tax year December 3, 2014 through November 30, 2015. HADDOW disclosed InCrowd's address as a specific apartment on 160 West 66th Street, New York, New York (the "66th St. Apt."). I have reviewed a lease provided by the landlord to the 66th St. Apt and signed by HADDOW, indicating that the 66th St. Apt. was leased to HADDOW as his "private residence" between at least November 1, 2014 and October 31, 2015.

### Bitcoin Store

   d. Bitcoin Store is a Delaware corporation that at all relevant times was principally owned and controlled by HADDOW. Bitcoin Store was incorporated on or about December 15, 2014. According to Bitcoin Store's offering materials, described in more detail below, Bitcoin Store purported to be an online platform allowing customers to easily purchase, sell, and store the digital currency known as "Bitcoin."

   e. On or about January 20, 2015, HADDOW signed Bitcoin Store's incorporation amendment as Bitcoin Store's president. On or about the next day, HADDOW bought all 20 million shares of Bitcoin Store for $2,000. Approximately two years later, on or about February 28, 2017, Haddow continued to list himself as president of Bitcoin Store on a Delaware franchise tax return.

   f. In 2015, HADDOW opened at least three bank accounts in Bitcoin Store's name (collectively, the "Bitcoin Bank Accounts"), designating himself as the sole authorized signatory on each account. The accounts were opened on or about February 18,

2015 at Capital One N.A, on or about May 13, 2015 at Capital One, and on or about August 3, 2015 at Wells Fargo Bank, N.A. The Wells Fargo account opening application submitted by HADDOW listed Bitcoin Store's address as the 66th St. Apt.

### Bar Works

g.  Bar Works is a Delaware corporation that at all relevant times was principally owned and controlled by HADDOW. Bar Works was incorporated on or about July 24, 2015.  On or about July 29, 2015, HADDOW bought all 20 million shares of Bar Works for $2,000.  According to Bar Works offering materials, Bar Works purports to be a company that adapts former restaurant, bar premises, and other locations into co-working spaces with "workspaces" for rent to the public in exchange for a membership fee.

h.  In 2015 and 2016, HADDOW opened at least four bank accounts in Bar Works's name, designating himself as the sole authorized signatory on each account through account opening forms or resolutions.  The accounts were opened on or about August 5, 2015 at Wells Fargo, December 24, 2015 at Chase, December 29, 2015 at Citibank, and February 16, 2016 at Chase.  The Citibank opening forms represented that HADDOW owned 100% of Bar Works.

i.  On or about February 5, 2016, HADDOW signed Bar Works' annual Delaware franchise tax report, listing himself as president of Bar Works and its only stated officer and director.

### OVERVIEW OF THE SCHEME TO DEFRAUD

7.  Based on my investigation to date, there is probable cause to believe that RENWICK HADDOW, the defendant, solicited investments in Bitcoin Store and Bar Works through the use of material misrepresentations about, among other things, the management, operations, and historical performance of those entities.  HADDOW solicited these investments through his control of InCrowd, without disclosing to investors that he had an ownership interest in both InCrowd, on the one hand, and Bitcoin Store and Bar Works, on the other.  HADDOW also misappropriated without permission funds purportedly invested in Bitcoin Store and Bar Works for his own use and the use of others.

### HADDOW SOLICITS INVESTORS THROUGH INCROWD

8.  I have interviewed multiple former employees of InCrowd as well as investors who were solicited by InCrowd's brokers to invest in Bitcoin Store and/or Bar Works, and also reviewed

reports, notes, and transcripts of interviews of brokers and investors by the SEC. I have reviewed financial records pertaining to InCrowd's bank accounts and internal InCrowd records produced by InCrowd to the SEC. Based on the foregoing, I have learned the following:

      a.    Between at least about March 2015 through December 2015, RENWICK HADDOW, the defendant, hired sales brokers at InCrowd through, among things, advertisements on the online site Craigslist. HADDOW did not require the brokers to hold any broker's licenses or have any experience in the financial industry.

      b.    Under HADDOW's management, the brokers solicited investors in the United States and abroad. According to a broker employed by InCrowd between in or about August 2015 and February 2016 ("Broker-1"), prospective investors were typically first cold-called by "qualifiers," who touted investments into Bitcoin Store or Bar Works and disseminated offering materials, and then again by "closers," who urged the prospects to invest. Broker-1 received the Bitcoin Store memorandum and related offering documents from HADDOW. Brokers received a salary and commissions based in part on the amount of Bitcoin Store and Bar Works securities sold. Brokers, including Broker-1, were paid in part through checks signed by HADDOW from the InCrowd 3084 Account.

      c.    According to an administrative employee hired by HADDOW ("Admin-1") who worked at InCrowd between at least in or about July 2015 and February 2016, HADDOW routinely provided Admin-1 with versions of the InCrowd marketing materials, Bitcoin Store's "Private Placing Memorandum" (the "Bitcoin PPM"), and Bar Works' offering documents to send to investors contacted by the brokers. Admin-1 routinely observed HADDOW in the InCrowd offices, typically sitting a few feet away from the brokers in an open room or in an adjoining office to the brokers. On occasions, Admin-1 witnessed brokers badgering, harassing and shouting at prospective investors.

      d.    One of the brokers employed by InCrowd ("Broker-2") was an unlicensed broker who worked at InCrowd between at least in or about November 2015 and February 2016. Broker-2 solicited investors over the phone for Bar Works and observed other brokers soliciting for Bitcoin Store. Broker-2 observed HADDOW in the InCrowd space on a regular basis, among other things, running the day-to-day banking activity and collecting incoming investor checks for deposit. On or about December 23, 2015, HADDOW told Broker-2, in part and substance, that HADDOW does not raise money through private placements for companies unless HADDOW owns the underlying company.

   e. Based on my review of banking and financial records associated with InCrowd and investors, I have learned that between at least in or about May 2015 through December 2015, InCrowd raised over $700,000 from more than 40 investors into Bitcoin Store. At least $590,000 raised by InCrowd was deposited or transmitted into the InCrowd 3084 Account controlled by HADDOW. Between at least in or about May 2015 through February 2016, InCrowd raised over $300,000 from more than 10 investors into Bar Works.

MISREPRESENTATIONS REGARDING BITCOIN STORE

  9. Investors, including Investor-1 and Investor-2 (as defined below) received the Bitcoin PPM through, among other means, email sent by representatives of InCrowd. The Bitcoin PPM offered investors up to $1.875 million in Bitcoin Store common stock at $0.75 per share, as well as up to one million units of convertible Bitcoin Store notes paying an 8% annual coupon, at $1 per share. Investors purchasing either security were instructed to submit payment either through a check payable to InCrowd Equity, direct bank transfer to the InCrowd 3084 Account, or via the InCrowd Website.

  10. A version of the Bitcoin PPM distributed from at least in or about May 2015 to various investors, made the following representations in part and substance:

   a. "Bitcoin Store Inc., is a US-headquartered group with a 100%-owned operating subsidiary in the UK – Bitcoin Store Limited. The group also controls online operating outlets www.Bitcoinstore.nyc and www.Bitcoinstore.london."

   b. "Bitcoin Store Inc. buys Bitcoin on behalf of clients and creates an online wallet for each client that is accessed via a private account number." "The Bitcoin Store service is simple, the commission is a flat 3% on all trades plus an annual account maintenance fee of £20/$35."

   c. "The Company commenced trading in December 2014 and with minimal marketing has generated gross sales of $1.95m up to 31st January 2015 and $5.61m for the three months to 30 April 2015 (cumulative $7.56m to 30 April 2015)."

   d. "The Proceeds of the equity and loan stock issues will be used for development and working capital of the group."

   e. Bitcoin Store is led by "an experienced team of leading investment professionals," consisting of three directors: "Gordon Phillips, CEO," "Joseph Bilkhorn, COO," and "David

Armstrong, FD." The Bitcoin PPM was purportedly signed by Bitcoin Store's "Chief Executive," "Gordon Phillips."

   f. According to the Bitcoin PPM, Phillips previously worked at HSBC as Global Head of Currency and Options trading, and at Deutsche Bank, and also received a Master of Science degree in finance from Yale; Bilkhorn had served as operations officer at Deutsche Bank and Chief Financial Officer and Head of Operations at Credit Suisse; and Armstrong worked as Finance Director at BlackRock.

  11. A predecessor version of the Bitcoin PPM dated March 2015 included substantially similar representations regarding the company's management, sales through January 31, 2015, and business operations.

  12. For the reasons described below, among others, there is probable cause to believe that, as RENWICK HADDOW, the defendant, well knew, the Bitcoin PPM's representations regarding the Bitcoin Store's trading and business operations, among other things, were false:

   a. As of on or about April 27, 2015, the only Bitcoin Bank Account that HADDOW had opened reflected an average balance of less than $500, and does not reflect any revenue from the claimed $7.56 million in sales through April 30, 2015 that were represented in the Bitcoin PPM. For the remainder of 2015, the Bitcoin Bank Accounts received approximately $195,000 in outside funds, excluding a $50,000 intra-Bitcoin Bank Account transfer. Of this money, at least about $87,000 had been raised from investors for an entirely different company controlled by HADDOW, Bar Works.

   b. On a federal tax return (the "Bitcoin Federal Tax Return"), Bitcoin Store reported that its taxable income for the period between December 15, 2014 and November 30, 2015 was negative $1,860. HADDOW signed the Bitcoin Federal Tax Return on or about September 6, 2016, as president of Bitcoin Store.

   c. In or about January 2016, the SEC conducted an onsite visit of InCrowd. Following the visit, HADDOW told Admin-1 that investor checks should no longer be directed to InCrowd but to the actual company for which the funds purportedly were being raised. In or about February 2016, HADDOW terminated most of the personnel and operations at InCrowd's Manhattan office.

  13. For the reasons described below, among others, there is probable cause to believe that, as RENWICK HADDOW, the defendant, well knew, the Bitcoin PPM's representations regarding the Bitcoin

Store's use of investor proceeds were false:

  a. Rather than directing Bitcoin Store investor proceeds to Bitcoin Store for its growth and development, as represented in the Bitcoin PPM, HADDOW appropriated all or nearly all of the funds in the InCrowd 3084 Account for his use and InCrowd's expenses and commissions.

  b. I have reviewed InCrowd's internal trial balance ledger as of November 30, 2015. The ledger acknowledged that InCrowd received approximately $740,000 of "income" from Bitcoin Store fundraising, as well as approximately a $45,000 "loan" from Bitcoin Store out of a total of approximately $1,061,000 of credited incoming funds (after netting a cancelled chargeback). InCrowd's debits, adding up to the same $1,061,000, evidenced no payments to Bitcoin Store, but were comprised of hundreds of thousands of dollars of payments for "outside services" to brokers and other InCrowd employees, representing salary and commissions, $82,737 in other designated "commissions," as well as $54,663 of "Loans to Shareholders: Cash Withdrawal" and $35,000 for "Loans to Shareholders: Renwick Haddow."

  c. Based on my review of the InCrowd 3084 Account, I have learned that in September and October 2015, HADDOW wired at least $35,000 from the InCrowd 3084 Account to various bank accounts controlled by himself. From the inception of the InCrowd 3084 Account through February 2016, HADDOW paid over $500,000 from the account to sales brokers, employees, and other agents of InCrowd.

  d. I have reviewed a purported Service Agreement between In Crowd Equity (UK) Limited ("InCrowd-UK") and Bitcoin Store Limited ("Bitcoin-UK"), "effective as of March 24, 2015." In it, Bitcoin-UK, the claimed wholly-owned U.K. subsidiary of Bitcoin Store, purports to agree to pay a "campaign fee" of $740,000 to InCrowd-UK. The fee is to be paid "regardless of the success of the campaign" and "will be collected directly from funds received by In Crowd Equity, Inc."

  e. The Bitcoin PPM concealed the existence of this purported agreement, through which InCrowd retained at least $740,000 of investor funds intended for Bitcoin Store.

  14. For the reasons described below, among others, there is probable cause to believe that, as RENWICK HADDOW, the defendant, well knew, the Bitcoin PPM's representations about the identity and backgrounds of its directors and officers were false and that HADDOW fraudulently concealed his own involvement in the Bitcoin

9

Store.

   a. Based on statements from representatives of Yale University, Deutsche Bank, HSBC, Credit Suisse, and BlackRock, I have learned that these institutions possess no record substantiating the alleged matriculation and work histories of "Gordon Phillips," "Joseph Bilkhorn" and "David Armstrong" as stated in the Bitcoin PPM.

   b. The Bitcoin PPM omitted HADDOW's name (and therefore his negative regulatory history). It also concealed HADDOW's control of both Bitcoin Store and InCrowd. Through the Bitcoin PPM, HADDOW represented that Bitcoin Store was managed by other officers and directors with fictitious backgrounds when, as HADDOW well knew, HADDOW had affirmed in numerous documents that he was, among other things, Bitcoin Store's incorporator, president, and sole shareholder.

   15. As part of the fraudulent scheme, the Bitcoin PPM directed investors to the InCrowd Website, www.incrowdequity.com, which made additional misrepresentations about the degree of independence between InCrowd and Bitcoin Store and InCrowd's fee. The InCrowd Website live as of May 14, 2015, stated, in part and substance:

   a. "What's to stop entrepreneurs from running away with my money? Us. We have a number of measures in place – including upfront checks as well as imposing personal liability on the entrepreneurs for fraud and pursuing criminal charges where appropriate – to ensure that the startup uses the investment for genuine business purposes."

   b. "We charge startups a fee of 7.5% of the money they successfully raise through In Crowd Equity. This means that we do not charge startups a fee to seek capital."

   16. Bitcoin Store was the only "open" start-up on the InCrowd Website at the time those representations were made.

   17. Contrary to these representations, as RENWICK HADDOW, the defendant, well knew, InCrowd and Bitcoin Store entities were owned and controlled by the same person, HADDOW. Furthermore, as of March 2015, InCrowd-UK had already been given the purported right to unconditionally retain $740,000 from whatever funds InCrowd would raise for Bitcoin Store.

   18. I have interviewed multiple Bitcoin Store investors who relied on versions of the Bitcoin PPM in making their investments,

including an investor from New Jersey ("Investor-1"), Oregon ("Investor-2"), and Colorado ("Investor-3"). Based on these interviews and my review of financial records, I have learned the following:

      a. On or about June 9, 2015, Investor-1 sent a $3,750 check to InCrowd to purchase 5,000 Bitcoin Store equity shares. On or about July 28, 2015. On or about August 14, 2015, Investor-2 sent $3,000 to InCrowd to purchase 3,000 Bitcoin Store notes. These payments were all deposited into the InCrowd 3084 Account.

      b. On or about October 22, 2015, Investor-3 sent a $10,000 check directed to Bitcoin Store, Inc. to purchase 10,000 Bitcoin Store notes. Although intended for Bitcoin Store, the check was endorsed by RENWICK HADDOW, the defendant, "to the order of Bar Works Inc." and deposited into a Wells Fargo account maintained by HADDOW for Bar Works.

      c. Investors in Bitcoin Store equity, including Investor-1, have not obtained any return on their securities. After making certain initial quarterly payments, Bitcoin Store has stopped making payments to investors on their Notes, including to Investor-2 and Investor-3.

### MISREPRESENTATIONS REGARDING BAR WORKS

    19. For the reasons described below, among others, there is probable cause to believe that RENWICK HADDOW, the defendant, engaged in a scheme to defraud victims by soliciting funds for, among other things, equity and lease investments in Bar Works and related entities through misrepresentations about, among other things, the management of Bar Works and concealment of HADDOW's control over the same.

    20. I have reviewed a copy of a press release dated September 8, 2015 (the "September 2015 Press Release"), in which Bar Works claimed to be "a new venture in the work space market, aiming to bring real vibrancy to the flexible working scene by adding full-service work spaces to former bar and restaurant premises in central city locations." The September 2015 Press Release claimed that Bar Works would earn revenue by "charg[ing] a flat monthly fee to users of [its] work spaces"—customers such as "entrepreneurs, freelancers, and travelling employees" who wanted a workspace outside their homes—through monthly membership fees that included not only regular access to a workspace but also services such as internet access, photocopying, coffee, "[h]eavily discounted" alcoholic drinks, and technical support.

11

21. Based on my review of Bar Works documents, as well as my conversations with former Bar Works employees and agents, among other things, I have learned the following:

    a. Bar Works raised funds from investors, among other ways, by selling "leases" coupled with "sub-leases" on individual workspaces in different Bar Works locations.

    b. To purchase a lease on a single workspace, investors paid a purchase price generally ranging from $22,000 to $30,000. Investors would then generally "sub-lease" their workspaces to a Bar Works affiliate.

    c. Bar Works or its affiliate typically agreed to pay each investor at least a designated monthly "rental" fee for the lease's duration, generally between 14% and 16% of the investor's investment, regardless of whether a paying customer could be obtained for the investor's workspaces—that is, whether Bar Works received some or no revenue on the relevant workspaces.

    d. Bar Works or its affiliate also generally promised to pay each investor back at least 100% of the purchase price for the corresponding lease at the end of the lease's term, usually ten years, or earlier in certain circumstances.

    e. Investors were also typically offered some additional profit if Bar Works succeeded in increasing the price it charged a customer on the investor's workspace.

22. Based on my review of Bar Works documents, banking records as well as other financial records and analyses, emails, and my interviews of former Bar Works employees and agents, among other things, I have learned that:

    a. Bar Works provided potential investors with various offering documents, the content and dissemination of which RENWICK HADDOW, the defendant, controlled.

    b. Various Bar Works offering materials and leases distributed between at least about September 2015 and January 2017, identified Bar Works' CEO as "Jonathan Black." These materials, frequently signed by "Jonathan Black," often described Black's purported experience as "finance director/financial controller of two chains of Bars in the UK (Regent Inns PLC – market value US$400m)" and touted his role in setting up "a number of new ventures, including recently 'Car Share,' a car sharing App."

12

c. I have also reviewed Bar Works leases with investors that were endorsed by "Jonathan Black" as CEO of Bar Works or its affiliates, including a particular lease signed by "Jonathan Black" as CEO of Bar Works Management Inc. on January 13, 2017.

d. "Jonathan Black," however, was a fictitious identity adopted by HADDOW to conceal his involvement in Bar Works as its incorporator and president. As with the Bitcoin Store offering materials described above, the Bar Works offering materials omitted HADDOW's name entirely.

23. Based on my interview of an employee of Bar Works ("Employee-1") who worked in various capacities for the company between at least about March 2016 and May 2017, including as the company's "CEO" and "Managing Director" in charge of day-to-day operations, I have learned that in or before August 2016, RENWICK HADDOW, the defendant, admitted to Employee-1 that he was "Jonathan Black."

24. Based on my interview of a master sales agent for Bar Works ("Agent-1") and my review of emails, among other things, I have learned the following:

a. Agent-1 coordinated at least $15 million in lease sales between at least in or about January 2016 and April 2017.

b. Agent-1 interacted regularly with RENWICK HADDOW, the defendant, and other Bar Works employees and agents during this time period.

c. Agent-1 never met "Jonathan Black" and based on his interactions with HADDOW and other associates of HADDOW, understood the "Jonathan Black" identity to be HADDOW's alter ego.

d. Agent-1 understood HADDOW to run Bar Works.

25. Based on my review of emails between another master agent ("Agent-2") and RENWICK HADDOW, the defendant, provided by Agent-2, I have learned the following, among other things:

a. HADDOW adopted the "Jonathan Black" identity in communications with third parties regarding Bar Works, including through the email account jonathan.black@barworks.com.

b. On or about March 3, 2016, Agent-2 forwarded HADDOW and another associate a request from a marketing agent to meet with

13

and record clips with "Jonathan Black." Agent-2 wrote, in part and substance, "Guys[,] How do we feel we can overcome the Jonathan issue…?? 'He's on honeymoon…!?!?'" HADDOW responded through his personal email account from the domain renwickhaddow.com ("Haddow Email Account-1") that the visitors may meet others at Bar Works who can "keep them occupied."

        c.    At approximately the same time, as evident through other emails between Agent-2 and HADDOW through Haddow Email Account-1, HADDOW was on his honeymoon.

    26.    Based on my interview of a Bar Works investor from Utah ("Investor-4"), and my review of documents provided by Investor-4, among other things, I have learned the following:

        a.    On or about December 5, 2016, Investor-4 invested $500,000 into Bar Works "workspaces" via wire transfer after receiving by email, reviewing, and relying on Bar Works offering materials that included, among other things, the misrepresentations about "Jonathan Black" discussed above.

        b.    Investor-4 stopped receiving his minimum payments from Bar Works or its affiliates as of May 2017.

    27.    Based on my conversations with Agent-1 and Employee-1 and a review of emails sent by Bar Works to investors, I have learned Bar Works systematically stopped paying investors their guaranteed payments at least as of about April 2017.

    28.    In or about April 2017, Bar Works investors received an email signed by Employee-1, stating in part and substance that, "[o]ver recent months, Bar Works has been facing difficulties with its banking facilities," that Bar Works is changing banking providers, and that Bar Works "will send rents/payments in batches as the new accounts are set up with our banking provider."

    29.    On or about May 11, 2017, Bar Works investors received an email signed by Employee-1 stating in part and substance that, "[t]he decision to temporarily halt payments to leaseholders was made separately when internal vetting showed that much of the company's liquidity was tied up in the expensive process of opening Bar Works locations that were far behind schedule."

    30.    Based on my interview with Employee-1, I have learned that RENWICK HADDOW, the defendant, had made and executed the decision to halt investor payments discussed in the May 11, 2017 email.

31. On or about May 23, 2017, Bar Works investors received an email signed by Employee-1 stating that he was resigning from the company, acknowledging that payments to investors had stopped, and stating that the "precise timetable for payments will be set by Bar Works' new management."

32. Based on my review of financial records, review of investor correspondence and complaints, and conversations with Agent-1 and Employee-1, I have learned that between at least about October 2015 through June 2017, RENWICK HADDOW, the defendant, caused to be raised at least $36 million from Bar Works' investors.

33. RENWICK HADDOW, the defendant, has transmitted at least $18 million from bank accounts associated with Bar Works and its affiliates to bank accounts in over 40 foreign countries, including in China, Cyprus, Morocco, Mauritius, Kuwait, Lebanon, Poland, Thailand, and Turkey, among others, . At least $16 million of that amount was to accounts that received over $100,000 each and are unlikely to represent guarantee payments to individual investors.

34. On or about March 20, 2016, Agent-2 and RENWICK HADDOW, the defendant, discussed the FCA's pending case against HADDOW in an email with the subject line "'F' Word". Agent-2 recommended, among other things, that HADDOW hire "great lawyers" and have a "[m]assive distance to special place (hard to get back)." HADDOW responded, in part and substance, "I agree with you totally."

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of RENWICK HADDOW, the defendant, and that he be imprisoned or bailed, as the case may be.

*[signature]*

Melissa Beresford
Special Agent
Federal Bureau of Investigation

Sworn to before me this
29th day of June 2017

*[signature]*

THE HONORABLE KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK