UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                    Plaintiff,                         No. 19 Cr. 340 (LTS)

          – v –

RENWICK HADDOW,

                    Defendant.

---

**SENTENCING MEMORANDUM ON BEHALF OF RENWICK HADDOW**

HUGHES HUBBARD & REED LLP
John T. McGoey
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000

*Attorneys for Defendant Renwick Haddow*

## TABLE OF CONTENTS

INTRODUCTION ..............................................................................................................1

FACTUAL BACKROUND...............................................................................................2

    I.      PERSONAL HISTORY.................................................................................2

    II.     NATURE OF THE OFFENSE .....................................................................4

    III.    PROCEDURAL HISTORY...........................................................................5

    IV.   IMPRISONMENT IN MOROCCO................................................................5

         1.      Tangier Prison................................................................................5

         2.      Sale Rabat ......................................................................................6

         3.      Argent I Rabat...............................................................................6

    V.     IMPRISONMENT IN THE UNITED STATES.............................................7

    VI.   SUPERVISORY RELEASE..........................................................................8

    VII.  COOPERATION WITH THE GOVERNMENT ..........................................9

         1.      Haddow's Cooperation Resulted in Tremendous Benefits to Law Enforcement..................................................................................9

         2.      Assistance in the Recovery of Assets ............................................9

LEGAL ANALYSIS........................................................................................................10

    VIII. ADVISORY SENTENCING GUIDELINES CALCULATION...........................10

    IX.   THE § 3553(a) FACTORS CALL FOR A NON-GUIDELINES SENTENCE....11

         1.      Mr. Haddow's Personal History and Characteristics Support a Non-Custodial Sentence....................................................................12

         2.      A Sentence of Time Served Would Reflect the Seriousness of the Offense and Provide Adequate Deterrence ...........................................12

         3.      The Court Should Employ Alternatives to Incarceration ...........15

    X.     MONETARY PENALTIES..........................................................................15

CONCLUSION...............................................................................................................15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007) ..................................................................11, 12

*Kimbrough v. United States*, 552 U.S. 85 (2007) ..............................................................11

*Koon v. United States*, 518 U.S. 81 (1996)........................................................................12

*Nelson v. United States*, 555 U.S. 350 (2009) ..................................................................11

*United States v. Aracena de Jesus*, 20 Cr. 19 (PAE) (S.D.N.Y. May 12, 2022) ...........14

*United States v. Booker,* 543 U.S. 220 (2005)....................................................................11

*United States v. Robles*, 553 F. Supp. 3d 172 (S.D.N.Y. 2021) ......................................13

*United States v. Rodriguez*, 492 F. Supp. 3d 306 (S.D.N.Y. 2020)................................13

**Statutes and Rules**

18 U.S.C. § 1343...................................................................................................................5

18 U.S.C. § 1349...................................................................................................................5

18 U.S.C. § 3553(a) ...............................................................................11, 12, 14, 15

18 U.S.C. § 3553(a)(1).......................................................................................................12

18 U.S.C. § 3553 (a)(1)-(7)................................................................................................11

18 U.S.C. § 3553(a)(2)........................................................................................................13

18 U.S.C. § 3553(a)(2)(B) & (C)........................................................................................14

18 U.S.C. § 3553(a)(3)........................................................................................................15

USSG § 2B1.1(a)(1).............................................................................................................10

USSG § 2B1.1(b)(1)(L) .......................................................................................................10

USSG § 2B1.1(b)(2)(B)........................................................................................................10

USSG § 2B1.1(b)(10)(B) .....................................................................................................10

USSG § 3B1.1(a)..................................................................................................................10

USSG § 3E1.1(a) and (b) ................................................................................................................10

USSG § 5K1.1 ................................................................................................................................10

USSG. § 2B1.1................................................................................................................................10

**INTRODUCTION**

This memorandum is submitted on behalf of Defendant Renwick Haddow ("Defendant" or "Mr. Haddow"), who is scheduled to be sentenced by the Court on July 23, 2026 in connection with his acceptance of a plea agreement and entry of a guilty plea on May 23, 2019. Mr. Haddow appears before the Court as a first-time offender who has accepted responsibility for his egregious misconduct. He feels great shame, has demonstrated considerable remorse, and, since his arrest on July 26, 2017, has endeavored to turn his life around. Following his arrest in Morocco, Mr. Haddow endured terrible conditions while imprisoned in three different facilities in that country. He was subjected to overcrowding, malnourishment, physical assault, and inadequate medical attention following an injury.

Since his extradition to the United States, Mr. Haddow has dedicated himself to his rehabilitation and demonstrating that his criminal actions, though undoubtedly serious, will never recur. Mr. Haddow's rehabilitation can be seen in his cooperation with the Government, which has been extraordinary in both its duration and scope; in his efforts to ensure he has met all conditions of his supervisory release since 2020; in his diligence in finding and maintaining employment, including taking a job as a dishwasher before working his way up to his current role as a bookkeeper; and in his attempts to integrate himself into his community and rebuild his relationships with his family. It is for these reasons that the United States Probation Office, in its Presentence Investigation Report ("PSR"), has recommended a non-custodial sentence. And it is for these reasons that we respectfully request that the Court impose a sentence of time served.

1

**FACTUAL BACKROUND**

## I.    PERSONAL HISTORY

Mr. Haddow was born on July 29, 1968, in London, England.  He is the eldest son of Ian Campbell Haddow and Kathy Haddow, and has one full sibling, Lorna Jane Haddow, with whom he shares a close relationship.  After obtaining a degree in accounting from West London University, Mr. Haddow held several accounting roles before launching his own business in 2001.

Mr. Haddow is the proud father of four children: (1) Lucy, age 26; (2) Sophie, age 21; (3) Harry, age 19; and (4) M.H., age 8.  Before his arrest in 2017, Mr. Haddow played a significant role in supporting his family, providing for his children and offering financial assistance to his parents when needed.  Since his arrest, and despite his family all living abroad, Mr. Haddow has endeavored to strengthen and maintain his relationships with his children and other relatives.

In a letter to the Court in support of his father,[1] Mr. Haddow's son, Harry, writes of how his father's physical absence during his formative years has negatively impacted him and how he hopes his younger brother, M., can be spared the same pain.  Harry also recalls discussions with his father regarding Mr. Haddow's regret for his misconduct and the pain it has caused his family.  In her letter, Mr. Haddow's daughter, Sophie, writes that Mr. Haddow "has always made an effort to stay in touch and maintain a relationship with us the best he could, through letters, emails, and phone calls and later, since his release on bail, being able to see him in New York occasionally."

---

1.    Attached as Exhibits A-J are letters from Kathy Haddow and Ian Haddow (Mr. Haddow's parents), Sophie and Harry Haddow (Mr. Haddow's children), Atabak Eshaghian and Neil Clarkson (Mr. Haddow's friends), Detective Thomas Garcia (Mr. Haddow's martial arts instructor), Asael Israeli (Mr. Haddow's employer), Marie Murphy (Mr. Haddow's co-worker), and Sam Aboud (Mr. Haddow's friend and cellmate in Morocco).

Mr. Haddow's mother, Kathy, notes Mr. Haddow's efforts to improve himself since his arrest, writing that he has "worked tirelessly to rebuild his relationships with his children" and that he has made "significant personal progress." Mr. Haddow's father, Ian, writes that Mr. Haddow's "main objective is to make amends for his wrongdoing and to win back the trust of the people who care for him." Ian Haddow also notes that his son continues to provide financial support to his family when possible.

Mr. Haddow currently resides in Far Rockaway, New York, where he has attempted to become part of the community both on a professional and personal level. Mr. Haddow has been steadily employed as a bookkeeper at Neviot Corp., an importer of Mediterranean foods, since September of 2022. In his letter of support, Asael Israeli, the co-owner of Neviot, writes that Mr. Haddow is a "reliable, punctual, and hard-working" employee who is well-liked and a valuable member of the Neviot team. Another Neviot employee, Marie Murphy, notes that Mr. Haddow is a "genuine, humble, and easygoing employee" who always arrives to work on time, regardless of whether there's rain, sleet, or snow to impact his three-mile commute by bicycle.

Since his arrest, Mr. Haddow has also become a dedicated student of martial arts. Mr. Haddow regularly trains at the Tru Force Arts studio in Rockaway Beach, which is owned by retired New York City Police Department Detective Thomas Garcia. In his letter of support, Detective Garcia writes that Mr. Haddow has become not just a dedicated student at his studio but "someone I regard with genuine respect." Detective Garcia describes Mr. Haddow as someone whose conduct has been "marked by humility, responsibility, and a willingness to better himself and support those around him."

Mr. Haddow's misdeeds were unquestionably grave and inexcusable. But it is also clear that, since his arrest, Mr. Haddow has attempted to change his life and instill in himself the

discipline that was lacking when he failed the victims in this matter.  That discipline is evident in how he has conducted himself as an employee, in how he has pursued martial arts, and how he has attempted to build his relationships with his family.

## II.   NATURE OF THE OFFENSE

Mr. Haddow readily admits that his actions in connection with the Bitcoin Store and Bar Works schemes were wrong, unlawful, and extremely damaging to the investors who placed their trust in Mr. Haddow and his partners.  We provide the following additional context for Mr. Haddow's participation in those schemes.

At its inception, Bar Works was intended to be a legitimate endeavor.[2]  In 2002, Mr. Haddow was a novice entrepreneur in London who considered renting the upper floor of his local pub to use as a workspace.  The idea stuck with him, and over a decade later, he launched a business focused on converting underutilized spaces into offices for freelancers and small businesses seeking flexible office arrangements.  When it was first established, Bar Works was generating profit by receiving payments from the workers and businesses who used the converted workspaces.  As Bar Works appeared to be gaining popularity, Mr. Haddow and his team began expanding the business, and only then did it start recruiting investors.

Problems arose as investment money began to pour in.  There was more investment interest than there were suitable properties to convert into workspaces.  Mr. Haddow and his partners were also trapped by the high rates of return they had recklessly promised to investors.  As the gap widened between incoming investments and actual income generated by the

---

[2]   Like Bar Works, Bitcoin Store was originally envisioned as a legitimate business, which was intended to provide investors an opportunity to gain exposure to cryptocurrency.  As with Bar Works, however, those intentions foundered as investments were diverted to pay expenses of both a business and personal nature.

workspace rentals, new investment funds were used to meet obligations to older investors. Now stuck in a vicious cycle of their own making, Mr. Haddow and his partners compounded their mistakes by using investment funds not just to pay senior investors but also to enrich themselves.

## III.   PROCEDURAL HISTORY

Mr. Haddow was arrested on July 26, 2017 in Morocco and extradited to the United States on April 12, 2018. Mr. Haddow appeared in the Southern District of New York on April 13, 2018. On May 23, 2019, Mr. Haddow pleaded guilty before the Honorable Ona T. Wang to two counts of wire fraud in violation of 18 U.S.C. § 1343 and two counts of conspiracy to commit wire fraud in violation of 18 U.S.C. §1349.

## IV.   IMPRISONMENT IN MOROCCO

Prior to his extradition, Mr. Haddow spent nine months (between July 2017 and April 2018) under harrowing conditions in three different detention centers in Morocco. Mr. Haddow's experience being detained in Morocco has resulted in extreme physical, mental, and emotional damage.

### 1.   Tangier Prison

Immediately following his arrest on July 26, 2017, Mr. Haddow was taken to Tangier Prison ("Tangier"). Though Mr. Haddow was only at Tangier for one week, the physical and emotional toll of the conditions there has had a lasting effect on Mr. Haddow's emotional wellbeing. Mr. Haddow's cell housed 20 inmates within less than 10 square feet of space. All 20 inmates slept on the ground near open sewers and shared a single hole in the ground to expel human waste. The inmates were confined to this cell for 22 hours a day during the week and 24 hours a day on the weekend. Additionally, Mr. Haddow, who only speaks English, was unable to communicate with the other inmates and staff.

5

### 2.    Sale Rabat

Mr. Haddow spent the next four months at Sale Rabat.  Like Tangier, the conditions at Sale Rabat constituted cruel and unusual punishment.  More than twenty inmates shared less than 10 square feet of space and a single hole in the ground as a bathroom facility, and lived amongst fleas, rats, and cockroaches.  In addition to the unsanitary conditions, inmates suffered from severe food deprivation and dehydration.

At Sale Rabat, Mr. Haddow was the victim of physical and verbal assaults by prison guards and other inmates on a regular basis.  Mr. Haddow's fear for his own life was exacerbated by witnessing the violence – physically, verbally, and sexually – experienced by other inmates.  At Sale Rabar, Mr. Haddow was imprisoned alongside Sam Aboud, a citizen of the United Kingdom.  Mr. Aboud has submitted a letter of support detailing the deplorable conditions in Sale Rabat, which conditions led to Mr. Aboud being diagnosed with Post Traumatic Stress Disorder after his return to the United Kingdom.  In his letter, in addition to detailing the depravities of the prison facility, Mr. Aboud also expresses gratitude to Mr. Haddow, who provided him support when Mr. Aboud's family was affected by the tragic fire at Grenfell Tower in London in 2017.

### 3.    Argent I Rabat

Mr. Haddow's third and final detention center before coming to the United States was Argent I Rabat ("Argent").  His stay at Argent lasted five months, and he was once again packed in a cell with approximately 20 other inmates.  At Argent, Mr. Haddow was forced to use a piece of carpet as a mattress and again dealt with food deprivation and dehydration.  He was also denied medical care after severely injuring his leg from a fall.  After pleading for medical attention for seven days, Mr. Haddow was finally seen by a doctor, but was given no leg support, pain relief, or treatment.  As a result of this injury and inadequate medical attention, Mr. Haddow

6

experiences regular, painful swelling of the knee and has difficulty walking.  Mr. Haddow has been informed by his physician that his knee injury will eventually require surgery.

Mr. Haddow's experiences in Moroccan prisons are consistent with the finding of Non-Government Organizations and Governmental bodies.  For example, the United Kingdom's Foreign, Commonwealth & Development Office warns travelers that "overcrowding is normal," that cockroaches and rats are common, that prisoners often sleep on floors, and that, in some facilities, "prisoners are locked up for as much as 23 hours a day." (https://www.gov.uk/government/publications/morocco-prisoner-pack/information-pack-for-british-prisoners-in-morocco#prison-conditionsservices.)  As discussed in Section IX below, the terrible conditions Mr. Haddow experienced during his confinement in Morocco argue strongly in favor of a sentence of time served.

## V.    IMPRISONMENT IN THE UNITED STATES

Following his extradition to the United States in April 2018, Mr. Haddow was detained at the Metropolitan Correctional Center (the "MCC"), which facility was subsequently closed in August 2021 due to its substandard conditions (albeit conditions that don't remotely approach what Mr. Haddow endured in Morocco).  While at the MCC, Mr. Haddow was housed in a dormitory-style cell with as many as 25 other inmates and without heating or temperature regulation.  He was permitted only three hours of outdoor time per week, which was frequently curtailed by facility-wide lockdowns.  Conditions became especially restrictive following the suicide of Jeffrey Epstein, which occurred at the facility in August 2019.

In February 2020, Mr. Haddow was moved briefly to the Metropolitan Detention Center in Brooklyn, New York (the "MDC") and subsequently to a correctional facility in Queens, New York where he stayed until April 2020.  During that period, as the COVID-19 pandemic began, Mr. Haddow was confined in a fully locked-down cell with several other inmates.  Because the

7

facility was particularly vulnerable to transmission of the virus, he and the other inmates were denied outdoor access and were not permitted to move about within the prison.

Despite the difficult conditions, Mr. Haddow pursued his rehabilitation efforts by tutoring other inmates, assisting them in obtaining GEDs, and working as a librarian in the Queens facility.

## VI.    SUPERVISORY RELEASE

In the midst of the COVID-19 pandemic, Mr. Haddow was released to home incarceration on April 29, 2020.  For the first year of his supervised release, he was fully confined to his apartment, permitted to leave only twice per week to obtain groceries and other necessities.  After adhering to all conditions of his home incarceration for more than a year, Mr. Haddow requested that he be allowed to leave his home in order to join the workforce.  The Court granted that application in June 2021, and Pretrial Services subsequently set an 8:00 p.m. curfew for Mr. Haddow.  Finding employment was not easy for Mr. Haddow, and the only jobs he initially found involved manual labor.  Many individuals with Mr. Haddow's educational background and experience in white collar work would have refused these types of roles, but Mr. Haddow was determined to find employment.  Mr. Haddow's first post-release job was as a dishwasher at an Uzbek restaurant called Uma's in Rockaway Beach.  He subsequently worked as a waiter for a catering company and as a food deliveryman for an agency that assists senior citizens.  Finally, in October of 2022, Mr. Haddow was hired as a bookkeeper by Neviot Corp.

Mr. Haddow's nightly curfew was lifted in December of 2022, though he continues to wear a GPS ankle monitoring device and report to Pretrial Services.  At the time of sentencing, Mr. Haddow will have been under supervision for over six years, during which time he has fully complied with all conditions of his release and not committed any infractions.

### VII.    COOPERATION WITH THE GOVERNMENT

#### 1.    Haddow's Cooperation Resulted in Tremendous Benefits to Law Enforcement

Mr. Haddow has provided sustained and substantial cooperation to the Government across multiple investigations.  His decision to accept responsibility and fully cooperate with the Government upon his return to the United States played a pivotal role in the cases against his former associates.  Mr. Haddow has attended more than twelve proffer sessions and offered detailed, comprehensive information regarding his co-defendants – James Moore, Savraj Gata-Aura, David Kennedy, James Robinson, and Steve Allen – explaining each individual's role in the Bar Works scheme and their knowledge of the fraud.

Mr. Haddow also served as the Government's key witness at trial against Moore, where he endured extensive cross-examination over the course of a day and a half and provided compelling testimony establishing Moore's role as the scheme's lead recruiter.  Separate from the proffer sessions he attended, Mr. Haddow sat for at least ten preparation sessions with the Government prior to his testimony.  His cooperation was also instrumental in the cases against Kennedy and Robinson, as his positive identification of those individuals and the information he provided helped secure their arrest in Spain and subsequent extradition to the United States.

As a result of Mr. Haddow's proffer sessions, trial testimony, and his status as a cooperator, the Government was able to secure a guilty verdict against Moore, guilty pleas by Gata-Aura, Robinson, and Kennedy, and a conviction in the United Kingdom against Allen.  Mr. Haddow's cooperation therefore resulted in the successful resolution of five cases against his former associates.

#### 2.    Assistance in the Recovery of Assets

Mr. Haddow also assisted in the identification and recovery of certain key assets.  Mr. Haddow initially provided lists of potentially recoverable assets, which included offshore bank

accounts, trusts, real property, and artwork.  With Mr. Haddow's help, the Government was able to recover approximately $1,000,000 from bank accounts in Morocco and $150,000 from bank accounts in the Bahamas.  In addition, Mr. Haddow identified two boats and 6 properties in various jurisdictions—including Morocco, Ecuador, Turkey, and the United Kingdom—and is presently cooperating in their sale and the repatriation of the resulting proceeds to the Government.  Recovering overseas assets is a complicated, lengthy process.  Mr. Haddow has joined dozens of calls and spent many hours reaching out to contacts in these jurisdictions in hopes of recovering the value of these assets and helping alleviate the damages suffered by the victims in this matter.

## LEGAL ANALYSIS

## VIII.  ADVISORY SENTENCING GUIDELINES CALCULATION

Sentencing Guidelines Section 2B1.1 governs the charges against Mr. Haddow.  Pursuant to Section 2B1.1(a)(1), the applicable base offense level is seven.  The Court will likely apply a 22-level enhancement for a loss amount more than $25,000,000 (USSG §2B1.1(b)(1)(L)); a six-level enhancement for an offense resulting in substantial financial hardship to 25 or more victims (USSG §2B1.1(b)(2)(B)); a two-level increase because a substantial part of the offense was committed in Spain and the United Kingdom (USSG §2B1.1(b)(10)(B); and a four-level enhancement because Mr. Haddow was an organizer or leader of the offense (USSG §3B1.1(a)).  A three-level decrease is appropriate due to Mr. Haddow's clear acceptance of responsibility for the offense and his assistance to the authorities in the investigation or prosecution of the offense (USSG §3E1.1(a) and (b)).  The defense does not object to the calculation of the Guidelines, but contends, pursuant to USSG §5K1.1, that Mr. Haddow's substantial assistance to the Government, and for additional reasons discussed below, that a non-Guidelines sentence is appropriate in this case.

10

**IX.    THE § 3553(A) FACTORS CALL FOR A NON-GUIDELINES SENTENCE**

The Supreme Court has repeatedly emphasized the advisory nature of the Sentencing Guidelines and has made clear that a district court must independently consider the Section 3553(a) factors before determining an appropriate sentence.  *See Gall v. United States*, 552 U.S. 38, 49-50 (2007); *Kimbrough v. United States*, 552 U.S. 85, 90 (2007) (stating that the Sentencing Guidelines "now serve as one factor among several courts must consider in determining an appropriate sentence."); *see also United States v. Booker,* 543 U.S. 220, 226-46 (2005).  Indeed, a within-Guidelines sentence, without equal consideration to all the Section 3553(a) factors, is no longer presumed to be reasonable.  *See Nelson v. United States*, 555 U.S. 350 (2009) (citations omitted).

The Section 3553(a) factors to be considered are as follows: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the advisory guideline range; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553 (a)(1)-(7).  When examining these factors, district courts should contemplate what would be "sufficient, but not greater than necessary" to accomplish the goals of sentencing.  18 U.S.C. § 3553(a).  Here, the Section 3553(a) factors weigh decisively in favor of a sentence of time served as the just and appropriate outcome consistent with that mandate.

1.    **Mr. Haddow's Personal History and Characteristics Support a Non-Custodial Sentence**

Section 3553(a) requires the Court to evaluate the "history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).  In making this assessment, a sentencing judge is "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall* at 52 (citing *Koon v. United States*, 518 U.S. 81, 113 (1996)).  Thus, while Mr. Haddow stands convicted before this court as a first-time offender, the manner in which he has led his life since his arrest is of critical consideration.

Mr. Haddow's posture as a defendant at the time of his sentencing is atypical.  He has been in the custody, or under the supervision, of the Moroccan and United States governments for almost nine years.  Following his arrest, Mr. Haddow immediately accepted responsibility for his actions, and as described above in Section VII, began providing substantial cooperation to the Government that helped secure the convictions of five of his associates, and has made substantial efforts to repatriate assets for restitution.  His cooperation has been candid, eager, and has now continued for more than eight years.

The Court also does not need to speculate as to whether Mr. Haddow will attempt to rehabilitate himself following his sentence.  He has endeavored since his release to prove that he already has.  Through his diligent efforts to obtain and maintain employment and his full compliance with all conditions of his supervisory release, Mr. Haddow has established that his mistakes are in his past and that he is capable of being a productive member of society.

2.    **A Sentence of Time Served Would Reflect the Seriousness of the Offense and Provide Adequate Deterrence**

In fashioning an appropriate sentence, the Court must also consider the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to

provide just punishment, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2).  In Mr. Haddow's case, all these purposes are properly served by a sentence of time served.

A sentence of time served will constitute just punishment, adequately reflect the seriousness of the offense, and promote respect for the law.  Mr. Haddow's life for the last nine years has been defined and shaped by this case.  His liberty has been restricted, his ability to see his children, family, and friends has been curtailed, his reputation has been destroyed, and he will forever live with the stigma of being a convicted felon.  No additional time in prison is necessary to punish Mr. Haddow or to underscore the seriousness of his offenses or promote respect for the law.

A sentence of time served is also appropriate given the conditions Mr. Haddow endured while detained in Morocco and in the United States during the COVID-19 pandemic.  These conditions, particularly the ones Mr. Haddow endured in Morocco, warrant credit in excess of the time he served because the circumstances of confinement were so extreme that each day was materially more punitive than a day in ordinary federal custody.  In Morocco, Mr. Haddow was held in overcrowded cells contaminated by human waste, subjected to excessive confinement with little meaningful movement or relief, and denied adequate medical attention despite sustaining serious injury.  Courts in this District have imposed lower sentences on defendants due to the conditions caused by COVID-19, which conditions, while unquestionably grueling, were still more livable than what Mr. Haddow endured in Morocco.  Such conditions made "incarceration harsher and more punitive than would otherwise have been the case" if he had been confined in the United States from the outset under ordinary custodial conditions.  *United States v. Rodriguez*, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020); *see also United States v. Robles*,

553 F. Supp. 3d 172, 182 (S.D.N.Y. 2021) (reducing defendant's sentence due partially to the conditions of incarceration); *United States v. Aracena de Jesus*, 20 Cr. 19 (PAE) (S.D.N.Y. May 12, 2022) (ECF 29 at 36) ("My colleagues and I commonly informally credit prisoners who have served time awaiting extradition in dreadful prisons overseas with more time served than by the calendar"). A sentence that treats Mr. Haddow's prior incarceration as equivalent to typical detention would understate the punishment he has already endured and would produce a sentence greater than necessary.

Pursuant to Section 3553(a), the Court is also required to consider whether the sentence imposed is needed to provide specific and general deterrence or to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(B) & (C). In this case, a sentence of time served will result in both specific and general deterrence. Specific deterrence is achieved by sending a message to a defendant that his criminal actions have consequences. Mr. Haddow has received this message and endured the consequences of his actions. He has reckoned with his mistakes, attempted to be as helpful as possible to the Government, and worked to integrate into his community on a personal and professional level. A sentence for time served will also serve general deterrence purposes because the message to potential offenders is clear that similar criminal conduct will result in the life-altering consequences that Mr. Haddow has experienced.

Lastly, as the letters submitted make clear, Mr. Haddow is not a criminal from whom the public needs protection. The people closest to Mr. Haddow, such as his mother, father, and son, Harry, attest to the remorse that Mr. Haddow feels, and his determination to remain a positive and productive member of society. As a first-time offender, Mr. Haddow is statistically similar to other Category I offenders and is not likely to recidivate. Moreover, Mr. Haddow has a high level of education, is gainfully employed, does not use drugs, and has close relationships with his

14

family.  Based on these variables, Mr. Haddow is in the lowest risk factor, with almost no chance of committing future crimes, according to the Sentencing Commission report on recidivism. United States Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview* (2016) (reporting that recidivism rates decrease with educational level; and that first-time offenders and fraud offenders are less likely to reoffend than offenders with criminal histories and offenders convicted of other federal crimes).[3]

### 3.    The Court Should Employ Alternatives to Incarceration

Section 3553(a) also requires the Court to consider "the kinds of sentences available" in a given case. 18 U.S.C. § 3553(a)(3).  A custodial sentence is not necessary in this case, and would impede the positive progress Mr. Haddow has made since his misconduct.  A sentence of time served will allow him to continue on the path of rehabilitation that he has walked for the last nine years.

## X.    MONETARY PENALTIES

Mr. Haddow is ready and eager to continue his efforts to assist in the repatriation of any available assets.  Beyond that, he lacks the monetary means to pay any additional penalties.  Mr. Haddow does not currently own any property or vehicles of his own and his total net worth amounts to $3,000.

## CONCLUSION

For the foregoing reasons, we echo the Probation Department's recommendation for a non-custodial sentence for Mr. Haddow.  We respectfully request that, in light of his prior imprisonment, his timely and substantial cooperation, his six years of supervised release, and his

---

[3]    https://www.ussc.gov/sites/default/files/pdf/research-and-publications/researchpublications/2016/recidivism_overview.pdf.

efforts to rehabilitate himself in the nine year since his arrest, the Court exercise its discretion to impose a sentence of time served, which would punish Mr. Haddow sufficiently yet still permit him to continue rebuilding his life and making positive contributions to his community.

Respectfully submitted,

/s/ John T. McGoey
John T. McGoey
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
john.mcgoey@hugheshubbard.com

16

**EXHIBIT LIST**

| Exhibit | Description |
|---------|-------------|
| A | March 22, 2025 Letter to the Hon. Judge Swain from Kathy Haddow |
| B | March 12, 2025 Letter to the Hon. Judge Swain from Ian C. Haddow |
| C | July 8, 2026 Letter to the Hon. Judge Swain from Sophie Haddow |
| D | Letter to the Hon. Judge Swain from Harry Haddow |
| E | March 27, 2025 Letter to the Hon. Judge Swain from Atabak Eshaghian |
| F | Letter to the Hon. Judge Swain from Neil Clarkson |
| G | May 30, 2025 Letter to the Hon. Judge Swain from Thomas Garcia |
| H | March 26, 2025 Letter to the Hon. Judge Swain from Asael Israeli |
| I | March 17, 2025 Letter to the Hon. Judge Swain from Marie Murphy |
| J | November 14, 2019 Letter to the Hon. Judge Swain from Sam Aboud |

## <u>CERTIFICATE OF SERVICE</u>

I, John T. McGoey, hereby certify that on July 9, 2026, I electronically filed the foregoing Sentencing Memorandum on behalf of Renwick Haddow with the Clerk of Court by using the CM/ECF filing system and sent by e-email a copy to U.S. Probation and the U.S. Department of Justice counsel of record.

/s/ John T. McGoey

_____
John T. McGoey, Esq.