**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

26 Federal Plaza, 37th Floor
New York, New York 10007

July 16, 2026

**BY ECF**
Hon. Laura Taylor Swain
United States District Chief Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Re:    *United States v. Renwick Haddow,* 19 Cr. 340 (LTS)

Dear Judge Swain:

The Government respectfully submits this letter in advance of sentencing of Renwick Haddow ("Haddow" or the "defendant"), which is scheduled for July 12, 2026 at 11:00 a.m.   On May 23, 2019, Haddow plead guilty to a four-count Information charging wire fraud and wire fraud conspiracy with respect to two separate fraudulent investment schemes, involving entities he created called Bitcoin Store and Bar Works.   Haddow was the architect of both schemes.   In 2014 and 2015, Haddow operated a boiler room in Manhattan that sold over $600,000 investments in Bitcoin Store with fabricated financial statements and fictitious management executives, without investing into Bitcoin.   In 2015 and 2016, Haddow, along with co-conspirators James Moore, Savraj Gata-Aura, James Robinson, David Kennedy (who not involved in Bitcoin Store),[1] helped launch and expand a new massive international Ponzi scheme in a coworking space company called Bar Works. The scheme, which ran until June 2017, ensnared over 800 victims worldwide who lost over $57 million.

Haddow was initially charged by Complaint in June 2017 and left the United States before he could be arrested.   He was arrested in Morocco in July 2017 and initially contested extradition. While in custody overseas, he expressed interest, through his attorneys, to cooperate with the Government's broader investigation and ultimately consented to extradition.   Haddow was extradited to the United States in April 2018, and immediately began cooperating.   He plead guilty on May 23, 2019 pursuant to a cooperation agreement.   As set forth in detail below, Haddow

---

[1] James Moore was convicted at trial on June 7, 2019, *United States v. Moore*, 18-cr-00759-RMB (S.D.N.Y.) on both charged counts, conspiracy to commit wire fraud and wire fraud.   On February 1, 2022, the Honorable Richard M. Berman sentenced Moore to a term of 140 months' imprisonment, to be followed by 3 years' supervised release. Gata-Aura pleaded guilty on November 18, 2019 to conspiracy to commit wire fraud, under the same docket as Moore, and was sentenced by the Honorable Jed Rakoff to 48 months' imprisonment on July 27, 2020.   David Kennedy and James Robinson were both arrested in Spain in November 2022, extradited, and pled guilty to conspiracy to commit wire fraud. Kennedy and Robinson were each sentenced by the Honorable Lewis A. Kaplan on May 7, 2024 and September 25, 2024 to 84 months' imprisonment under docket 21 Cr. 344 (LAK) (S.D.N.Y).

provided substantial assistance in connection with the investigations and prosecutions of four other co-conspirators in the Bar Works scheme: (1) business partner James Moore, who was convicted at trial where Haddow testified, (2) Haddow's right-hand man Savraj Gata-Aura, and United Property Group co-founders James Robinson and David Kennedy, who were arrested and extradited from Spain after Haddow's trial testimony was public and pleaded guilty with knowledge of Haddow's cooperation.  Haddow has also provided substantial assistance with efforts to recover his assets from around the world to make available for forfeiture and restitution.

In light of the facts set forth herein, and assuming that Haddow continues to comply with the terms of his cooperation agreement and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the United States Sentencing Guidelines (the "Guidelines") and18 U.S.C. § 3553(e), that the Court sentence Haddow in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

## I.  <u>Summary of Criminal Conduct</u>

### A.  **Haddow's Notorious Schemes in the United Kingdom**

Prior to launching Bar Works, Renwick Haddow led multiple widely-publicized Ponzi schemes in the U.K. in which investors lost money.  PSR ¶ 25.  In November 2008, the Companies Investigation Branch of the Insolvency Service of the U.K., an agency responsible for investigating serious corporate abuse in the U.K. disqualified Haddow from serving as a director of any company registered in the U.K. for a period of eight years, through about November 2016.  *Id.*  According to an online press release published by a U.K. government and public sector news service in December 2008, Haddow had served as a director of a failed U.K. company whose investors lost all or substantially all of their investments and agreed that he made various misleading statements about its financial position and prospects.  *Id.*

In July 2013, the U.K.'s Financial Conduct Authority ("FCA") brought a civil action against Haddow and others for allegedly running various unauthorized collective investment schemes, including a scheme involving African land ventures ("African Land") and another scheme selling investments into carbon credits ("Carbon Credits"), that raised £16.9 million in funds through, among other things, misleading statements to investors.  PSR ¶ 26.  In February 2014, the High Court of Justice, Chancery Division ("High Court") ruled, in substance, that the schemes at issue were in fact unauthorized collective investment schemes.  *Id.*  The ruling was publicized online. *Id.*  On or about March 26, 2018, the High Court additionally found that these schemes were unlawfully promoted to the public by false, misleading and deceptive statements and mandated that Haddow and his co-conspirators pay a total of £16.9m in restitution to victims.  *See* Press Release, FCA Wins Case Against Capital Alternatives Limited and Others, available online at https://www.fca.org.uk/news/press-releases/fca-wins-case-against-capital-alternatives-limited-and-others (last accessed April 10, 2024).  Investors had lost substantially all their money in these schemes.

### B.  **Haddow Moves to the United States for a "Fresh Start" and Launches the Bitcoin Store Fraudulent Scheme**

In or about October 2014, Haddow moved to the United States for a "fresh start" because, as he testified at trial, he had a "very bad reputation in the U.K., for a number of financial misendeavors

which was covered on the internet, and it meant that I couldn't really operate further in the U.K." Tr. 201; PSR ¶ 27.   Once here, Haddow first launched a fraudulent scheme selling investments into a non-functioning digital cryptocurrency company he created called Bitcoin Store.   PSR ¶ 27.   The investments were sold out of a high-pressure boiler room Haddow set up in New York.   The offering materials for Bitcoin Store included profiles of company management that were fictitious individuals.   *Id.*   In reality, Haddow controlled the company, the company did not purchase or sell any Bitcoins.

Haddow introduced one of his future co-conspirators in the Bar Works scheme, Savraj Gata-Aura, to the Bitcoin Store scheme.   Gata-Aura had previously worked in the United Kingdom as the owner of a business called Core Agents, who had access to agents skilled in selling various investment opportunities to the public.   After coming to the United States in the summer of 2015, Gata-Aura worked in Haddow's boiler room at ICE for approximately three weeks.   Gata-Aura reviewed Bitcoin Store's brochures and made a small number of investor pitch calls, before declining to further participate in the Bitcoin Store promotion, because he did not believe it to be a successful concept.   Gata-Aura was paid at least $1,000 from Haddow for his work promoting Bitcoin Store.

Bitcoin Store was not a successful solicitation.   In 2015, Haddow started creating a larger fraudulent scheme involving a new company called Bar Works, and looking for professional agent networks to promote it beyond Haddow's own boiler room.

### C.    Haddow Creates Bar Works

In July 2015, Haddow created Bar Works, a Manhattan-based company which purported to adapt former bars, restaurants, and other spaces into coworking venues with "workspaces" for rent to the public in exchange for a membership fee.   PSR ¶ 28.   Over the course of the next two years, Bar Works opened multiple locations in New York City, as well as in San Francisco and elsewhere. *Id.*

Haddow and co-conspirators including James Moore, Savraj Gata-Aura,[2] James Robinson, and David Kennedy collectively raised over $57 million dollars from investors in Bar Works.   PSR ¶ 21, 36. The investments were structured as a ten-year "lease" and reciprocal "sub-lease" on individual workspaces in different Bar Works locations.   PSR ¶ 29.   To purchase a lease on a single workspace, investors paid a purchase price, ranging from $22,000 to $30,000, and then would generally "sub-lease" their workspaces back to a Bar Works affiliate.   PSR ¶ 29.   Bar Works, or its affiliate, agreed to pay each investor a guaranteed monthly "rental" fee for the lease's duration, regardless of whether a paying customer could be obtained for the investor's workspace.   *Id.*   The guaranteed yearly rent represented about 14-16% of the investor's investment.   In addition to the rent payments, Bar Works promised to return each investor's original investment back at the end of ten years.   *Id.*   Put another way, Bar Works was guaranteeing that in the course of ten years, it

---

[2] On November 18, 2019, Gata-Aura appeared before the Honorable Jed S. Rakoff and pleaded guilty to conspiracy to commit wire fraud in connection with the Bar Works scheme, under docket S1 18-CR-759-002 (JSR). Although not signed to a cooperation agreement, Gata-Aura made efforts to cooperate with the Government and provided extensive financial information pertaining to the victims of the scheme to aid the Government's forfeiture efforts. On July 27, 2020, the Judge Rakoff sentenced Gata-Aura principally to 48 months' imprisonment.   Haddow has not yet been sentenced.

would return at least 240% of each investor's money. The revenue to support these investor guarantees was supposed to come from paying members utilizing Bar Works' workspaces; beginning with its first offering documents, Bar Works falsely claimed that it was "profitable."

Because Haddow earned extensive notoriety and online publicity as the architect of multiple Ponzi schemes that were being actively prosecuted by regulators in the United Kingdom, Haddow could not use his own name in connection with marketing materials for Bar Works. PSR ¶ 30. Instead, just as he did with the Bitcoin Store scheme, Haddow invented a fictional CEO, now named "Jonathan Black" to be the public face of the business. *Id.* "Jonathan Black" issued press releases and statements to investors, signed investor leases and certificates, and when necessary, even communicated directly (on the phone only) to investors. *Id.* "Jonathan Black" had a fake Linked-in page and a detailed biography in Bar Works' offering materials. *Id.* The marketing materials did not mention Haddow at all.

The Bar Works offering documents also falsely represented that the company was profitable. PSR ¶ 31. It claimed, among many other things, that the first Bar Works location that opened in October 2015 at 47 West 39th Street in Manhattan was "already profitable." *Id.* But Bar Works only had a small handful of paying customers. *Id.* Even with heavy discounts to minimize the appearance of vacant offices, the paying membership business was sparse. *Id.* These customers' subscription fees failed to cover Bar Works' rent and company expenses, much less return any money for investors. *Id.* Indeed, as Haddow testified, Bar Works was never profitable as a business. Tr. 205.

The investment was initially sold in 2015 as an investment in equity or convertible loan notes of Bar Works itself, marketed through Haddow's own boiler room. Attempting to sell Bar Works through his personal boiler room carried significant risk, however, and made it difficult for Haddow to rapidly expand the sales operation. In late 2015, Haddow closed the boiler room, and restructured the investment opportunity as the purchase of a lease/sublease into workspaces that would be sold through professional agent networks that targeted potential investors worldwide in exchange for a commission.

### D.    James Moore, David Kennedy, and James Robinson agree with Haddow to Sell Bar Works Under False Pretenses

In 2015, UPG, was a Spain-based company with its own network of sales agents who solicited investors on various property investments in return for commissions. PSR ¶ 32. UPG was founded and operated by Robinson and Kennedy. In the summer of 2015, a long-time friend of Haddow's named James Moore was working with Robinson and Kennedy to sell Spanish property investments to the public through UPG's agent network. *Id.*[3] That same summer, Moore visited Haddow in Manhattan, who showed Moore his high pressure boiler room. *Id.* Moore initially asked Haddow if he would use the boiler room to sell UPG's then-operative real estate investment project in Spain. *Id.* Haddow declined, explaining that he was focusing his efforts on preparing to sell investments in the new coworking space venture called Bar Works.

---

[3] Kennedy, Robinson, Moore, and Haddow are all U.K. nationals. Moore and Haddow had worked together on a prior failed investment project.

Moore expressed interest in partnering on that project and told Haddow that he could bring in UPG to sell Bar Works to investors—if Moore were to become Haddow's business partner in the scheme.   PSR ¶ 33.   In the Fall of 2015, Haddow sent Moore draft offering materials for Bar Works describing CEO Jonathan Black.   When asked about Black, Haddow admitted to Moore that Black was fictitious.   Moore shared the information with UPG's other principals, Robinson and Kennedy, and—with their approval—continued pursuing a deal with Haddow to sell Bar Works through UPG.

In November 2015, UPG's principals, Robinson and Kennedy accompanied Moore to New York to meet with Haddow and discuss how UPG would sell Bar Works, which by then had launched its first location.   PSR ¶ 34.   They participated in a presentation, led by Moore, encouraging Haddow to incorporate the so-called WealthBuilder concept into Bar Works' offering, through which investors would be promised higher returns, ranging up to 16% a year, if they bought multiple workspaces.   Haddow agreed.

The evidence at trial also showed that Haddow, Moore, Kennedy and Robinson discussed that Jonathan Black was fictitious and the importance of maintaining "email etiquette" in their communications about Jonathan Black to avoid creating incriminating evidence.   Moore, Kennedy, and Robinson negotiated an agreement with Haddow through which UPG would receive a 30 percent commission for each investor it recruited.   PSR ¶ 34.   Moore (unbeknownst to Kennedy and Robinson) had a secret side deal with Haddow, through which Moore separately would earn 35 percent commission from UPG-recruited investors as a direct partner in the Bar Works scheme overall.   *Id.*   In total, unbeknownst to investors, UPG and Moore would collectively be paid *65 percent* of each UPG-recruited investor's money that was purportedly going toward the running of the Bar Works business.   *Id.*

Haddow agreed to give up 65% of UPG investors' money to UPG and Moore because he needed a professional agent network that could sell Bar Works to unsuspecting victims, and a small group of trusted insiders who could act as a front and insulate Haddow from agents and investors while vouching for Jonathan Black.   PSR ¶ 35.   These insiders, like Robinson and Kennedy, knew about Haddow's bad reputation running the prior African Land and Carbon Credits schemes and his need to conceal himself.

The documentary evidence at Moore's trial plainly demonstrated that Moore, Robinson, and Kennedy were happy to help Haddow hide the truth from investors in exchange for exorbitant payoffs and a hoped-for exclusive right to sell Bar Works to victims.   When Moore, Robinson, and Kennedy discovered that Haddow had offered another agent a distribution right that competed with UPG's supposedly "exclusive" sales right, they discussed their leverage over Haddow and ability to expose him.   After hearing that Haddow essentially responded, "who cares?" when confronted by Moore about the competing agent (Tr. 325), Robinson wrote to Kennedy and Moore: "I wonder if Renwick would care more about people knowing Bar Works is his and his history in carbon credits and lost investments would damage his Bar Works reputation."   PSR ¶ 36.

Robinson also reiterated to Kennedy and others early in the scheme: "Renwick does not give a flying fuck about anything with integrity. Well, guess what, as long as he pays on the deals we and our agents do then I do not care how he runs his projects."   PSR ¶ 37.   Ultimately, Robinson and Kennedy did not expose Haddow, and continued participating in the scheme to defraud investors in order to earn over two million dollars.   *Id.*

E.    **Robinson and UPG Help Haddow Structure the Scheme and Create Fraudulent Investor Documents**

In helping Haddow launch the Bar Works scheme, Robinson, Kennedy, and Moore provided input on drafts of Bar Works' investor-facing documentation that would be sent to victims whom they euphemistically called "clients."    PSR ¶ 38.    They even commented on the similarity between Bar Works' "certificates" of ownership to "certificates" used in Haddow's prior Ponzi schemes. The certificates were meaningless and gave no real property interest.    *Id.*    In September 2015, Haddow sent Moore a draft Bar Works certificate to be signed by Jonathan Black; Moore then forwarded it to Kennedy and Robinson for their review.    *Id.*    Robinson replied to Kennedy and Moore:

> Its [sic] obvious that the first attachment is some sort of attempt at a client [i.e. investor] feeling like they hold a deed, but as it's a certificate it reminds me of carbon credits in a big way, but hey that worked so no reason to redesign the wheel being round I suppose. . . . The T&C's appear to be a rather simple, yet crude, attempt at a form of contract for a buyer. Again, the very simple play that the carbon credit market used when it came to client facing documentation. Again, if that worked, which it did, then no issues from me, K.I.S.S.

As Haddow testified, the carbon credits investments generally, and his scheme in particular, were all "scams" and what "worked" in that scheme was that "[i]t was very successful in terms of selling to investors."    Moore, Kennedy and Robinson also succeeded in having Haddow increase the supposedly guaranteed returns offered to investors who bought multiple workspaces—which in turn made it easier for UPG to raise more money and increase their own commission.

By the Summer of 2016, however, disputes over commissions led to a breakdown between Haddow, Moore and UPG.    Moore and the UPG principals then launched a competing coworking space investment scheme in the summer of 2016, called Our Space and ceased selling Bar Works, after bringing in approximately $7.5 million from over 100 individual victims.

F.    **Kennedy, Robinson, Moore, and Haddow Defraud Investors**

UPG's agent network predominantly recruited investors located outside the United States—victims who could not easily visit the locations, verify claims about the business, and see their workspaces for themselves.    PSR ¶ 39.    UPG recruited at least one U.S. investor, however, with Robinson and Kennedy's knowledge.    That victim ("Victim-1") invested $125,000 to Bar Works in March 2016, and for which UPG invoiced $37,500 or the agreed-upon 30% commission.    *Id.* Victim-1 testified at Moore's trial and presented evidence of UPG's fraudulent solicitations.    *Id.*

Between approximately October 2015 and June 2016, Robinson, Kennedy, and Moore succeeded in having UPG launch Bar Works as a sought-after investment opportunity, and recruited over 155 victims who invested at least approximately $7,499,000 in Bar Works.    PSR ¶ 40.    UPG's agents, supervised and directed by Robinson and Kennedy, disseminated misrepresentations about Jonathan Black and the viability of the business to investors.    *Id.*

In November 2015, after Kennedy and Robinson met with Haddow in New York to discuss how to run the scheme, maintain the Jonathan Black fiction, and divide the proceeds, UPG's

employee agents were falsely assuring investors that UPG's principals had met with *Jonathan Black*, had done their due diligence, and concluded that Bar Works was a safe investment short of a "World War III" type scenario.  PSR ¶ 41.  For example, when a victim ("Victim-2") posed questions about Jonathan Black and the safety of the investment, a UPG agent represented that:

> The CEO, Jonathan Black, has a sterling reputation and was previously the finance director and comptroller for Regent Inns PLC. In regards to security then, as far as we can tell, having delved very deeply into the Bar Works model (when my directors flew to meet Jonathan and his team in NYC, they visited the building, and looked at some of the competitor spaces -- We Work sites) that the investment is not only safe, but very much a game changer for any individual's portfolio. . . . The only risk we can establish is a World War III doomsday one whereby NYC shut down as a global capital of business and commerce.

PSR ¶ 42.

Subsequently, when Victim-2 asked to speak to Jonathan Black directly before making a $600,000 investment, Kennedy, Robinson, Moore, and Haddow coordinated to have Haddow speak to Victim-2 pretending to be Jonathan Black.  PSR ¶ 43.  As Haddow testified, he called James Moore immediately afterwards, giggling about the ruse:

> . . . I was very excited because this guy sounded very interested; it looked like he was going to potentially invest upwards of 600,000, maybe even more. He was offering maybe up to a million dollars, so I was very excited that I had made a big contribution in this conversion. So, I rang up Jim and said to him that Jonathan has just got off the phone with [Victim-1] and he's had a really good call. And Jim's immediate response was, "you mean you did." I said, "no, no, Jonathan did." And then I giggled and laughed about it a little bit, and we moved on to another subject.

Tr. 356-357.

As a result, Victim-2 invested and lost $600,000. PSR ¶ 43.

Robinson and Kennedy received proceeds from the Bar Works scheme in the following way. UPG recruited investors to send investments to accounts controlled by Bar Works entities, including accounts listed in the Bar Works offering documents.  PSR ¶ 46.  In turn, Bar Works bank accounts would send UPG commissions, based on 30% of each investor's investment to an account at TTT Moneycorp Limited, a U.K.-based foreign exchange company with which UPG SL held an account ("UPG Moneycorp Account"). [4]  *Id.*  Robinson and Kennedy controlled the UPG Moneycorp Account.  *Id.*  At least $2,156,300 was sent from accounts in the name of Bar Works Inc., or Bar Works 7th Ave, to the UPG Moneycorp Account between November 2, 2015 and May 31, 2016.  *Id.*  Robinson and Kennedy subsequently used that money to pay expenses and divide

---

[4] As noted above, Moore occupied a higher position in the criminal hierarchy than Kennedy and Robinson as Haddow's business partner in Bar Works overall.  Separate from UPG's 30% commission, Moore had a deal with Haddow to be paid a 35% commission on any investors' funds raised by UPG, minus certain expenses of operating the Bar Works business.

profits.

Ultimately, in the summer of 2016, Haddow, Moore, Robinson and Kennedy, had a falling out. Haddow was failing to pay all of the promised commissions to UPG, and was striking deals with non-UPG agents, like Savraj Gata-Aura, to whom he could pay smaller commissions. PSR ¶ 44. Moore wrote to Haddow, "If anything is unforgiveable here, that's it – deliberately fucking your business partner who helped you put this on the map." PSR ¶ 44. Haddow testified that UPG and Moore in fact helped put Bar Works on the map and make the fraudulent scheme a success. Tr. 391.

As their dispute with Haddow escalated, in the summer of 2016, Kennedy, Robinson, Moore and others launched their own co-working space investment project called Our Space, which was strikingly similar to Bar Works. PSR ¶ 44. Critically, the evidence indicates that these co-conspirators did not leave Bar Works because they suddenly opposed the fraudulent nature of the scheme; they left to generate more money and have better control over their own copy-cat offering. By approximately July 2016, Robinson and Kennedy had shifted UPG's agents to sell Our Space investments to the public instead of Bar Works. *Id.* And even while pitching their old Bar Works victims to make new investments into Our Space, UPG never revealed its knowledge of the Bar Works fraud in which it had been complicit.[5]

After UPG's shift to Our Space, Haddow relied on other agents who stepped in to sell Bar Works, including those coordinated by co-defendant Savraj Gata-Aura. PSR ¶ 45. Several victims who were initially recruited by UPG continued to invest money into Bar Works. *Id.*

## G.      Gata-Aura's Role in the Scheme

For much of the Bar Works scheme, Gata-Aura served as Haddow's functional right hand man, and the force that brought nearly $40 million of investors' money through an extensive agent network fueled by huge commissions. At the beginning of the scheme, Gata-Aura was principally competing for commissions with James Moore and the UPG network. By the summer of 2016, Moore and UPG left their partnership with Haddow over disagreements around commissions, Gata-Aura's poaching of UPG agents into his own network, and in order to begin selling a competing co-working space investment venture Our Space. PSR ¶ 45. Like the other co-conspirators, Gata-Aura knew the truth about Haddow and "Jonathan Black." He became aware of the fact that Bar Works' legitimate revenues from paying members were too meager to even pay the company's own expenses, much less support guarantees of 14-16% yearly returns to investors. He knew that investors were largely paid out of other investors' money. He nonetheless lied repeatedly to agents and investors to grow and prolong the Ponzi scheme and solicit new funds. In exchange for his efforts, Gata-Aura received approximately $3 million from victim funds.

Gata-Aura made numerous misrepresentations to investors as part of the scheme to cover up Haddow's involvement and legitimize the Bar Works' business. He distributed profit figures and projections to investors that he knew were made up. He falsely claimed Bar Works was profitable.

---

[5] According to public reports, Our Space raised millions of dollars and then failed causing significant losses to foreign investors. PSR ¶ 35. Robinson, Kennedy, and Moore were not charged with any offenses related to Our Space.

He falsely sold investments into specific, numbered, workspaces as if they were real, income-generating desks.   He knew that most Bar Works' "workspaces" were simply numbers on an excel spreadsheet not connected to any physical workspace or income stream.

When potential investors or other third parties insisted on visiting Bar Works in New York or asked to meet with "Jonathan Black," Haddow relied on Gata-Aura to meet with them instead. For example, in March 2016, Moore e-mailed Haddow that a team of potential sales partners wanted to meet Jonathan Black in New York and record some clips with "Jonathan" for marketing purposes. Moore wrote to Haddow, "Guys How do we feel we can overcome the Jonathan issue…?? He's on honeymoon…!?!?"   At the time, Haddow was on his actual honeymoon.   *Id.*   Haddow, under his real name, wrote back, "They can meet Sam [Aura] and Zoe [Haddow's wife] and our new PR. That should be enough and you guys can keep them occupied."

As noted, there was insufficient demand for Bar Works workspaces from the public to cover the company's expenses, much less the guaranteed payoffs to investors, and the investment scheme operated in a Ponzi-like fashion.   Haddow was using new investment money to pay "rent" to old investors.   Haddow also used investor funds to pay Gata-Aura, Moore, and others for their participation in the scheme, as well as to fund his own lavish lifestyle.

As part of his agreement with Haddow, Gata-Aura was entitled to a commission of either 30% or 35% of investors' money brought in through his sub-agent network, minus the commission to be paid to the individual agents, which comprised a range of about 5%-25% of the investment. In most cases, Gata-Aura collected approximately 5-10% of the investor's investment.   In all, Gata-Aura received approximately $2,988,225 in commissions from investors' money.   With Haddow's assistance, Gata-Aura also established a number of offshore entities to receive the proceeds of the scheme.

### H.      Bar Works Unravels, Haddow Flees

In January 2017, an investigative report was published on the internet exposing Haddow as the architect of Bar Works, together with a history of his prior U.K. schemes, and evidence that Jonathan Black was fake.   In the coming months, new investor money dried up.   In April 2017, Haddow stopped making payments to investors.   In June 2017, Haddow fled the United States days prior to being charged by Complaint.   Bar Works began to close its locations. Tr. 396-97.   He was arrested in Morocco the following month, detained, and eventually extradited to the United States.

### I.      Haddow's Other Uncharged Conduct

In compliance with his obligation to disclose to the Government any other crimes that he committed, Haddow fully disclosed additional misconduct to the Government for which he cannot be prosecuted by this Office under the Rule of Specialty governing his arrest and consensual extradition from Morocco.

As testified to by Haddow at trial, Haddow participated in various U.K.-based schemes that raised investor money typically through misrepresentations and omissions, and usually resulted in investor losses.   These included his operation of an investment company called Catalyst Investment Group Ltd beginning in 2001 which raised money for about 20 companies, including some controlled by Haddow or a family member.   One such company was Branded Leisure, which

Haddow controlled and that operated bars, restaurants and beauty stores.  On December 10, 2008, the U.K. Insolvency Service issued a news release announcing Haddow's disqualification as a director for eight years due to misrepresentations made to investors in Branded Leisure. Haddow agreed to a stipulation that said that he caused or allowed Branded Leisure to make an inaccurate and misleading announcement as to the progress of the company's building work, sales performance of the company, and the financial performance of the company, causing investors to lose £500,000.

As Haddow also testified at trial, in approximately 2009, Haddow and Moore partnered on a hotel investment scheme called Room to Invest.  Room to Invest offered investors fractional interests in hotel rooms.  Investors would buy these interests and then receive returns supposedly from customers using their hotel rooms.  During the trial, Haddow testified that Moore wanted Room to Invest to sell interests in a hotel in Barbados, even though Moore had not actually built the hotel and thus would have no way of paying investors returns for a long time, if ever.  Haddow turned down selling the Barbados property but invited Moore to partner up with him to sell investments in two real hotels in Slovenia and Morocco. Moore agreed and helped to restructure the investment to make it more attractive to investors by adding a guaranteed return for buying multiple units.  Moore also brought in agents to actually solicit investors.  In return, Moore received half of Haddow's profits from the operation.  Room to Invest solicited about 300,000 to 500,000 pounds after Moore partnered with Haddow, before collapsing, resulting in investor losses.

As mentioned above, from 2009 to 2013, Haddow participated an African Land/Carbon Credits scheme in which he and others raised approximately £16.9 million in part through fraudulent misrepresentations to investors.  Haddow was the main architect of these schemes.

During the Ba Works scheme, in 2016, Haddow reported that he also launched a spin-off called Podworks, a similar workshare office space model. The Podworks project did not target American investors, but rather, only international investors.  Haddow used the "Jonathan Black" identity in connection with Podworks offering documents and to give phone interviews to journalists. Haddow raised approximately $100,000 from investors before ceasing work on Podworks. Haddow was arrested not long after, and the investors were not repaid.

Haddow admitted that he laundered nearly all of his profit from the Bar Works scheme— after paying expenses and commissions to agents and co-conspirators.  He laundered the money through multiple shell companies, bank accounts, and real property abroad, including in the United Kingdom, Morocco, and the Bahamas, among other places.

## II.    **Applicable Law**

As the Court is well aware, although the United States Sentencing Guidelines are no longer mandatory, they provide strong guidance to courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).    Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49.   The Guidelines' relevance stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives." *Rita v. United States*, 551 U.S. 338, 348 (2007).   After making that calculation, the Court must consider the seven factors outlined in 18 U.S.C. § 3553(a), which include

10

the nature and circumstances of the offense, the history and characteristics of the defendant, the need to deter criminal conduct and promote respect for the law, the need to protect the public from further crimes of the defendant, and the need to avoid unwarranted sentencing disparities.   *Gall*, 552 U.S. at 50 & n.6.   If the judge "decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."   *Id.*

### III.   Analysis of Section 5K1.1 Factors

As the Court is aware, Section 5K1.1 of the Guidelines sets forth five non-exclusive factors that sentencing courts are encouraged to consider in determining the appropriate sentencing reduction for a defendant who has rendered substantial assistance.   *See* U.S.S.G. §5K1.1(a).   The application of each of those factors to Haddow's cooperation is set forth below.

1.   Timeliness of the Defendant's Cooperation

Haddow's cooperation was extremely timely in helping to charge and convict his entire inner circle of co-conspirators—the master agents who knew the truth about Bar Works and worked hand in hand with Haddow to recruit unsuspecting investors from around the world.   Moore and Gata-Aura in particular were critical to the success of the fraud because they could put themselves in between Haddow (who was concealing his identity) and the agents actually responsible for raising investor money, who often attempted to conduct their own due diligence.

On April 13, 2018, Haddow's extradition to the United States was effectuated and publicized in a press release.   Haddow provided documents and a detailed accounting of various investment fraud schemes, his written communications with his co-conspirators, and acknowledged his own culpability.   On May 8, 2019, Haddow pleaded guilty pursuant to a cooperation agreement.

Haddow's testimony was timely in assisting the Government's prosecution of James Moore. Moore was arrested on August 27, 2018, four months after the Government began debriefing Haddow.   While the documentary evidence against Moore was extremely strong, and included multiple inculpatory emails, Haddow provided a behind the scenes look into many additional calls and meetings where the scheme was hatched and expanded.   Haddow then testified at length in Moore's trial – taking place over nine hours, across three days.   He candidly walked through his own past frauds in the UK in extensive detail, how he started doing business together with James Moore in 2009, and how they reconnected in 2015 to began the Bar Works fraud. He described the moment when he revealed to James Moore how he was masquerading as Jonathan Black and how they partnered with the UPG founders to bring in more investors.   He testified about meetings in New York with Moore and the UPG founders.   He described a specific phone calls with a critical investor arranged by Moore and UPG where Haddow took on the Jonathan Black persona.   That testimony was also consistent with the victim's own testimony at trial.   He explained the "e-mail etiquette" rules they created to describe Jonathan Black as a real person (while asking Haddow to issue documents from Jonathan Black) should their emails ever fall into the wrong hands. Haddow's testimony was corroborated and credible.

James Moore was found guilty on June 7, 2019, of wire fraud and conspiracy to commit wire fraud following a week-long jury trial before U.S. District Judge Richard M. Berman.   On February

11

1, 2022, Moore was sentenced to 140 months in prison by Judge Berman. Moore was also ordered to pay restitution of $57,579,790.00, forfeiture of $1,599,257.46, and a fine of $50,000.

Haddow's cooperation was also timely in the prosecution of Savraj Gata-Aura.   Notably, in 2017, prior to Haddow's extradition, Gata-Aura was interviewed twice by the Government and voluntarily provided certain documents related to his connection to Bar Works and information identifying investors in Bar Works, among other things.   During these interviews, however, Gata-Aura substantially minimized his role in the offense and his own misrepresentations to investors. As a result, the Government did not pursue cooperation of Gata-Aura. Although the Government's investigation of Gata-Aura's role was at an advanced stage, the Government was not in a position to charge Gata-Aura in 2017.   Haddow's cooperation, potential testimony, and voluntarily produced electronic evidence was highly significant in the Government's ability to charge Gata-Aura shortly after Haddow's own guilty plea and entry into a cooperation agreement in 2019.

On May 23, 2019, based on part on corroborated information provided by Haddow, the Government unsealed an indictment charging Gata-Aura with wire fraud conspiracy in connection with Bar Works.   On the same day, the Government unsealed Haddow's guilty plea, and publicly acknowledged Haddow's cooperation.   With knowledge of Haddow's cooperation, Gata-Aura pled guilty on November 18, 2019, to one count of wire fraud conspiracy and was sentenced to four years in prison on July 27, 2020, by U.S. District Judge Jed. S. Rakoff.

Finally, with the benefit of Haddow's cooperation, the Government charged the UPG founders David Kennedy and James Moore and secured their arrest in Spain in November 2022. Among other things, the Government provided both defendants transcripts of Moore's trial, including Haddow's testimony on direct and cross examination, and the exhibits introduced at trial demonstrating Moore (and by extension the UPG founders') guilt.   Kennedy and Robinson promptly pleaded guilty after beign extradited and were each sentenced by the Honorable Lewis A. Kaplan on May 7, 2024 and September 25, 2024 to 84 months imprisonment.

2.   Nature, Extent, Significance, and Usefulness of the Defendant's Assistance

Haddow provided critical firsthand information that was used to corroborate many relevant data points that were very valuable to the successful investigation and prosecution of Moore, Gata-Aura, Kennedy, and Robinson. Some of the information provided by Haddow could not be obtained from any other persons.

As described in detail above, Haddow's cooperation was significant and extremely useful, particularly with respect to the charges, trial, and ultimate conviction of Moore.   Haddow had direct communications with Moore throughout the criminal conspiracy and voluntarily provided documents plainly evidencing Moore's knowledge of the criminal nature of the Bar Works scheme and Haddow's fake identity as Jonathan Black.   This evidence was crucial since Moore claimed, in defense, that he was duped to the same degree as the investors he recruited to join Bar Works.

Haddow also provided an insider's view of the relationship between himself, Moore, Robinson, and Kennedy that was entirely concealed from investors, and the UPG founders' criminal knowledge and participation in the scheme, corroborated by emails.   This cooperation was key to undermining any potential claims by the UPG founders that they simply acted in the same capacity

12

as scores of other legitimate agents who sold Bar Works without knowledge of Haddow's involvement and misrepresentations about offering documents.

Finally, Haddow provided key evidence about Gata-Aura's day-to-day conduct in recruiting investors into Bar Works through misrepresentations about Haddow's role and Bar Works' profitability. While Haddow was undeniably the architect and most culpable member of the Bar Works conspiracy, that central role also made his knowledge extremely helpful in convicting the second, third, and fourth most culpable members of this conspiracy responsible for recruiting vast majority of investor money flow.

Additionally, Haddow has assisted the Government in the collection of his forfeitable assets. These efforts include Haddow stipulating to the forfeiture of his interest in a yacht club for an amount of $1,215,441, assisting in the collection and forfeiture of various art works possessed by Haddow, and making efforts to assist in the forfeiture of certain foreign properties and bank accounts owned by Haddow.

In short, Haddow has done everything asked of him by the Government as a cooperating witness. His cooperation was fruitful and resulted in significant charges being brought by the Government. Furthermore, Haddow has continued to abide by the terms of his pretrial supervision since his release in April 2020.

### 3.  Truthfulness, Completeness, and Reliability of Information Supplied by Defendant

With regard to the "truthfulness, completeness, and reliability" of the defendant's information, *see* U.S.S.G. § 5K1.1(a)(2), there is no question that Haddow's conduct *prior to* his decision to cooperate with the Government was consistent with that of an experienced fraudster. He raised millions of dollars from investors in schemes in the U.K. and the United States for over a decade. He admitted to having a long history of misstatements to investors and lies to securities regulators, the FCA and the SEC.

However, over the course of over twelve meetings with Haddow before and after his being signed up as a cooperating witness, Haddow was forthcoming and truthful about his own criminal conduct and that of other individuals involved in fraudulent payment processing schemes. Expressing remorse for his conduct, Haddow approached his cooperation with diligence, a positive attitude, and with the goal of doing everything he could to account for his crimes. The information provided by Haddow was corroborated by documentary evidence collected over the course of the investigation, including from e-mails obtained from search warrants and reviews of mobile devices, and was helpful in allowing the Government to better understand the workings of Haddow's inner circle of co-conspirators.

In his initial proffers, Haddow, like many defendants, minimized his understanding that BarWorks was a Ponzi scheme from the beginning, as opposed to a legitimate business that simply failed to repay the outsized guarantees being made to an investors. He was immediately forthright, however, that he raised money from investors through misrepresentations about the business, its management, and its profitability. And when walking through the financials of the business, Haddow quickly admitted that it became readily apparent that Bar Works' revenues would be insufficient to pay investors' rent guarantees without using other investors' money. Further, from

the first counsel proffer with the Government, Haddow made it clear that he would take responsibility for his significant role in the crimes, and went further by telling the Government about his prior foreign criminal conduct in the U.K.

Furthermore, Haddow provided the Government extensive information about his assets, and undertook efforts to attempt to retrieve assets held by shell companies abroad.

>    4. Danger or Risk of Injury to the Defendant or His Family Resulting from Cooperation

There was no substantial danger or risk of injury to the defendant or his family resulting from his cooperation.

## IV.    Conclusion

In light of the facts set forth above, and assuming that Haddow continues to comply with the terms of his cooperation agreement, the Government intends to request at sentencing that the Court sentence him in light of the factors set forth in Section 5K1.1 of the Guidelines.

The Court should also orally pronounce at sentencing a forfeiture money judgment against Haddow in the amount of $57,579,790, consistent with the consent preliminary order of forfeiture previously entered on October 24, 2023. Dkt. 66.[6]

Finally, the Court should enter the proposed restitution order attached here as Exhibit A, in the amount of $58,200,987.44, while maintaining the schedule of victims under seal.

---

[6] A final order of forfeiture as to the specific property referenced therein was entered on September 8, 2025. Dkt. 81.